Filed 7/30/14  P. v. Espinosa CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B248395 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA381208) |
| v. | |
| ALBERTO ANTONIO ESPINOSA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Henry J. Hall, Judge.  Affirmed in part, and reversed in part with directions.

Rachel Varnell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Yun K. Lee and Peggy Z. Huang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Alberto Antonio Espinosa appeals from a judgment of conviction entered after a jury found him guilty of assault with a firearm (Pen. Code,[1] § 245, subd. (a)(2)) and also found true the allegations that Espinosa committed the crime for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)) and that he personally used a firearm (§ 12022.5, subd. (a)). The trial court sentenced Espinosa to state prison for a total of 18 years, consisting of the upper term of four years, plus 10 years for the criminal street gang enhancement and four years for the personal firearm use enhancement.

Espinosa argues that substantial evidence does not support the jury's finding on the criminal street gang enhancement. Espinosa also argues that he did not receive a fair trial because one of the prosecution's witness revealed to the jury that Espinosa previously had been on probation and arrested. We affirm the conviction but reverse the sentence because of an unauthorized sentence, and remand the matter for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 15, 2011 Christina Perez, Daniel Canas, and their baby daughter were in a white van traveling uphill on Millburn Drive in Los Angeles en route to the house where Perez lived with her mother. As Perez, who was pregnant with the couple's second child, drove up the hill, a "vanilla cream" Chrysler 300 came down the hill, driven by Espinosa, Perez's former boyfriend, whom she only knew by his nickname of Travieso. Canas observed that Espinosa was driving erratically and too fast. Canas reached over from the passenger seat of Perez's car and honked the horn. After he had passed, Espinosa made a U-turn and came back up Millburn Drive.

---

[1]     All undesignated section references are to the Penal Code.

Espinosa, who was alone in his car, rolled down his window, and Canas told him to be careful where he was going and to stay away from Perez "for the baby's sake, mostly." Espinosa responded, "Where you from?" and "What's up? What's the problem? What's up? What's going on? What's up?"[2] Canas understood that the question "Where are you from?" meant "What gang are you from?" Canas, who was not a member of a gang and did not know what gang Espinosa was in, responded, "I'm not from nowhere. Why? What's up? What's going on? What's up with you?" Espinosa then yelled "City Terrace," which is a criminal street gang. After Perez made a U-turn so that she could park facing downhill, Canas got out of Perez's car and responded, "It has nothing to do with your neighborhood," "Fuck City Terrace," and "I have family from gangs, from the Avenues." Canas was very upset and again told Espinosa to stay away from Perez and his daughter. Espinosa made a movement, and Canas "saw something that looked like a gun."

Perez heard Espinosa ask Canas where he was from. Although Perez did not hear Espinosa say "City Terrace," she knows that City Terrace is a gang and that her house is within the territory claimed by City Terrace. Perez wanted to avoid a confrontation and moved between the two men "trying to stop the argument." She told Canas "to keep his mouth shut" and not to start problems with someone who was no longer a part of her life.

Espinosa then drove away. Perez gave a sigh of relief and said, "Just go. We don't want any problems." Perez then went to pick up their baby from the van, and Canas started walking up the driveway toward the house.

Less than a minute later, Espinosa returned with a passenger, Jimmy Cervantes, who, like Espinosa, was a member of the City Terrace gang. Canas observed that the passenger window was down. Cervantes said, "What's the problem?" or "What's going on over here?" Canas walked back toward Espinosa's car and saw Espinosa take out a

---

[2] Counsel for Espinosa impeached Canas with his testimony at the preliminary hearing that Espinosa did not ask him where he was from. Canas told the deputies who responded to Perez's 911 call, however, that Espinosa had asked, "Where are you from?"

3

black and chrome handgun, "like a .38 or .45 caliber handgun, automatic pistol," like the ".45 [that] served our country well in World War II." While the car was moving slowly, Espinosa reached across Cervantes and pointed the gun out the passenger window. Canas could clearly see the gun, the driver, and the passenger. Canas was afraid, "[f]or obvious reasons," but he was also very angry. Perez then asked Espinosa, "What are you doing pulling out a gun? My daughter's here." A second later, Espinosa drove away.

Perez called the police. The recording of the 911 call, which the People played for the jury,[3] included conversations between Perez and the 911 operator and conversations among Perez, her mother, and Canas. On the recording, Perez stated that she had "just seen some gang members" pass by her house and pull out a grey or chrome gun and point it at Canas. Perez said that Canas had instigated the confrontation. When asked if she knew the name of the person with the gun, Perez said that she only knew "his gang affiliated name," Travieso, but she did not know his real name. When the 911 operator asked what gang Travieso was from, Perez answered, "He's from City Terrace." The recording also included statements by Perez that she believed her house was now a "target" and "now they're really gonna shoot" at her house.

Los Angeles County sheriff's deputies arrived and Perez gave a recorded statement.[4] In her statement to the responding deputy, she described both encounters with Espinosa. Perez stated that when she first saw Espinosa (whom she only knew as Travieso from City Terrace),[5] she was close to his car. She saw him reach for the gun and was able to see part of the gun in his hand. When Espinosa returned, she saw him

_____

[3]     Pursuant to the parties' stipulation, the court reporter did not transcribe the contents of Perez's 911 call. The trial court, however, admitted a transcript of the recording into evidence.

[4]     The People also played portions of Perez's recorded statement for the jury. Although again pursuant to the parties' stipulation the court reporter did not transcribe it, the trial court admitted a transcript of the recorded statements into evidence.

[5]     Perez identified Espinosa in a field show-up.

4

pull out a gun and point it at Canas. Perez stated, "Travieso didn't pull the gun out on me, but Travieso did see me. He pulled it out and pointed it at [Canas]." Perez said that Espinosa pulled the entire gun "all the way out" while the passenger (Cervantes) was "yelling, 'Hey fool where you from? Hey fool where you from? What's up fool,' and stuff like that." Perez called to her mother, "Go inside, there's a gun . . . I'll call the . . . cops." Perez also told the detectives that she thought Espinosa "was going to come back and shoot" because of his gang affiliation.

At trial, Perez remembered very little of her conversation with the 911 operator, and she did not remember any of her conversation with the deputy sheriffs. She testified at trial that she heard Canas say Espinosa had a gun, but she never actually saw the gun. She admitted, however, that she had told the police that day that she saw a gun. Perez also testified that, although she and Canas had a "history, not a good history, you know, of issues," she was "trying to stick by [her] man," just "trying to make things work," and "was going to say" whatever he said. She stated, "I didn't figure he'd make it up, but I didn't see it."

Los Angeles County Sheriff's Detective Frank Alvarado testified as a gang expert for the prosecution. He worked for over 15 years as a "gang-detail deputy" and patrolled "gang-infested areas" of East Los Angeles and Compton. At the time of trial, Alvarado was assigned to investigate cases involving the City Terrace 13, Cudahy 13, Winter Gardens, and Arizona Maravilla criminal gangs.

Alvarado explained that the City Terrance 13 gang has been in existence since the 1970's and that in February 2011 it had approximately 90 members. City Terrace gang members "have the 'CT' followed by the 13, and they like to use the Spanish version se te," and they use "the Minnesota Twins' emblem, which is the C and the T letters intertwined together, similar to their baseball caps." He further explained that the number 13 represents "their association with southern Hispanic gangs, and the 13th letter of the alphabet being M, and 'M' standing for Mexican Mafia, indicating that [the] City Terrace 13 gang has allies and accepts the rules of the Mexican Mafia." He stated that the primary activities of the City Terrace 13 gang are "[p]ossession of firearms, sales and

5

distribution of narcotics, robberies, assault with deadly weapons, shootings, things of that nature." Alvarado testified that he knew Espinosa "[f]rom numerous contacts" as "a member of the City Terrace 13 gang and he was known as Travieso." He stated that Espinosa has a tattoo of the letter "C" on his right arm, a tattoo of the letter "T" on his left arm, and "CTR" on his knuckles, all of which are City Terrace gang tattoos. He also said that Espinosa drives a Chrysler 300.

Alvarado testified that disrespect on a personal level can transition into "disrespect on a gang level" because by disrespecting an individual in a gang a person can disrespect the gang that the individual represents. Alvarado stated that a gang member advertises that he or she is part of a certain gang with "[t]attoos, shouting . . . out [the name of the gang], vandalisms, indicating spray paintings on the walls . . . ." Alvarado explained that "[s]houting out" is when a gang member, "especially in the commission of a crime, indicat[es] your gang name when you commit a crime or shortly thereafter or as you're leaving, which is common." Gang members identify the name of their gang in this way "to show their adversaries how great they are, how bold they are, and to show them that's their gang and they're not to be disrespected and we're the best of the best," as well as "to instill fear and intimidation against their adversary and to let them know that they're out there, they're not going to be disrespected, and they're going to defend their neighborhood at whatever cost."

Alvarado also testified that the question, "Where are you from," is a "confrontational" question. "If a rival or a gang member says where are you from, essentially he's trying to gain information from the other person, which neighborhood or gang they represent, and if they are rivals, the chances of an assault or something happening are [imminent]." He also confirmed that saying "Fuck City Terrace" would be disrespectful. Finally, he opined in response to a hypothetical question based on facts

6

virtually identical to those in this case,[6] that Espinosa committed the crime for the benefit of and in association with the City Terrace 13 gang. Alvarado's opinion was "based on the fact of [the] mere confrontation of asking 'Where are you from' is saying that [the] individual is going to be an adversary, and the mere fact of pulling out a firearm is promoting fear and intimidation not only in the witness but in other individuals who may have seen this crime. That's what gangs use to thrive on is fear and intimidation. . . . And in association, when that individual picked up the second individual who may have been a member of the same gang." Alvarado explained that it was important that Espinosa picked up a passenger before he returned for the same reason deputies have backup, and for "[a] second set of eyes out there for what's potentially going to happen, some dangerous situation." Having a witness also proves the person's loyalty to the gang, toughness, and reputation within the gang. Alvarado added that speaking the phrase "Where are you from" and bringing along backup can change a confrontation that may have begun as personal into a confrontation that is gang-related.

## DISCUSSION

A. *There Was Substantial Evidence To Support the Jury's Finding on the Criminal Street Gang Allegation*

Espinosa argues that his due process rights were violated because there was insufficient evidence to support the jury's finding that the criminal street gang allegation was true. He argues that "the prosecution failed to establish that the crime was committed for the benefit of or in association with City Terrace" and that "the assault appears to have resulted from a domestic dispute" arising out of jealousy or romantic rivalry between Espinosa and Canas over Perez. We conclude that, although there may

---

[6] Counsel for Espinosa objected to the hypothetical question on "four grounds," but the discussion regarding the objection occurred off the record at side bar. The trial court overruled the objection, and Espinosa has not challenged that ruling on appeal.

have been some evidence of a personal dispute between the two men, there was substantial evidence to support the jury's finding that Espinosa threatened Canas with a gun for the benefit of or in association with the City Terrace 13 criminal street gang.

In order to prove a criminal gang enhancement under section 186.22, subdivision (b), the People must prove beyond a reasonable doubt that the defendant committed the felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." This statute "requires proof of only two elements: (1) that the defendant committed a felony for the benefit of, at the direction of, or in association with any criminal street gang and (2) that he did so with the intent to promote, further, or assist in criminal conduct by gang members. [Citation.] It does not require proof that a defendant acted with the specific intent to promote, further, or assist a gang. [Citation.]" (*People v. Mejia* (2012) 211 Cal.App.4th 586, 613.) Espinosa argues only that the People failed to meet their burden on the first element.

The People may and usually do prove the elements required for a criminal street gang enhancement through the testimony of experts in gang culture. (See *People v. Vang* (2011) 52 Cal.4th 1038, 1045; *People v. Gardeley* (1996) 14 Cal.4th 605, 618.) Answering "hypothetical questions based on other evidence the prosecution presented . . . is a proper way of presenting expert testimony." (*People v. Gonzalez* (2006) 38 Cal.4th 932, 946; see *People v. Valadez* (2013) 220 Cal.App.4th 16, 29 ["California law permits gang experts to rely on reliable hearsay evidence to form an opinion, even if the evidence would otherwise be inadmissible"]; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1120 ["[e]xpert testimony is admissible to establish the existence, composition, culture, habits, and activities of street gangs; a defendant's membership in a gang; gang rivalries; the 'motivation for a particular crime, generally retaliation or intimidation'; and 'whether and how a crime was committed to benefit or promote a gang'"].) The People can also rely on evidence of the defendant's gang activity. (See *People v. Carr* (2010) 190 Cal.App.4th 475, 489 ["a jury may rely on evidence about a defendant's personal conduct, as well as expert testimony about gang culture and habits, to make

findings concerning a defendant's active participation in a gang or a pattern of gang activity"].)

The evidence at trial, viewed in the light most favorable to the judgment, was sufficient to support the jury's finding that Espinosa assaulted Canas with a firearm for the benefit of or in association with the City Terrace 13 street gang. (See *People v. Albillar* (2010) 51 Cal.4th 47, 59-60 ["[i]n considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt"].)

First, Espinosa gave Canas the common gang challenge preceding violence, "Where you from?" Alvarado testified that asking that question is an act of aggression indicating that a gang-related assault or other crime is about to occur.[7] Even if there were elements of the dispute between Espinosa and Canas that were personal, by asking "Where you from," Espinosa escalated the confrontation with Canas to one for the benefit of or in association with City Terrace 13.

---

[7] As experts and other witnesses have uniformly testified in other cases, this question is commonly recognized as a gang-related question. (See, e.g., *People v. Medina* (2009) 46 Cal.4th 913, 917 [former gang member explained that "when a gang member asks another gang member 'where are you from?' he means 'what gang are you from?' a question that constitutes an 'aggression step'"]; *People v. Partida* (2005) 37 Cal.4th 428, 441["gang expert explained that 'Where you from?' constitutes a 'challenge' in the gang culture . . . with 'no correct answer'"]; *People v. Miranda* (2011) 192 Cal.App.4th 398, 412 ["expert testified that when a gang member asks someone where he or she is from, it is a prelude to a confrontation (either verbal or violent) even if the person responds that he is not from a gang"]; *People v. Reyes* (2009) 172 Cal.App.4th 671, 681 ["[w]hen approaching others in their territory, the local gang member usually inquires, 'Where are you from?'"]; *People v. Felix* (2008) 160 Cal.App.4th 849, 854 ["'"Where are you from?"' . . . understood to be a demand for a gang affiliation"]; *People v. Perez* (2004) 118 Cal.App.4th 151, 157 ["[w]hen a gang member asks 'Where are you from,' he is planning to engage in violence"].)

Second, Espinosa called out the name of his gang when he confronted Canas during the first encounter. Alvarado explained that shouting out the name of the gang, as Espinosa did, during the commission of a crime is common and identifies that person with a particular gang. Calling out the name of the gang is for the benefit of the gang because it demonstrates the strength of the gang, that the gang is entitled to respect, and that the gang members will defend the gang's territory. It also helps spread fear and intimidate those who may be adverse to, or consider testifying against, the gang.[8]

Third, Canas made statements that disrespected Espinosa's gang, which necessitated a response from a member of the gang. Alvarado explained that Canas' response "Fuck City Terrace" and his statement that he had family in a gang not only showed disrespect to Espinosa, but showed disrespect for the entire City Terrace gang that Espinosa represented.[9]

---

[8] Calling out the name of a gang while committing a crime is also commonly recognized as a way to benefit the gang. (See, e.g., *People v. Miranda*, *supra*, 192 Cal.App.4th at p. 412 [expert explained that "[w]hen a gang member announces his gang affiliation during commission of a crime, the entire gang is benefited by an enhanced reputation"]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1162 [defense expert testified that "[w]hen a group commits a gang crime, it is customary for them to yell out their gang's name"].)

[9] It is generally recognized that respect is an integral part of gang culture and that disrespect requires a response. (See, e.g., *People v. Tran* (2011) 51 Cal.4th 1040, 1045 [noting gang expert's testimony that "respect is of paramount importance to gangs, and that gang members will shoot members of a rival gang to enhance the reputation of their own gang, to benefit their gang's recruitment processes, and to send the message that gang members will react violently to acts of disrespect committed against the gang"]; *People v. Medina*, *supra*, 46 Cal.4th at p. 918 [noting gang expert's testimony that "gang members view behavior that 'disrespects' their gang as a challenge and a 'slap in the face,' which must be avenged" and that "if no retaliatory action is taken in the face of disrespectful behavior, the challenger and others will view the gang member and the gang itself as weak"]; *People v. Galvez* (2011) 195 Cal.App.4th 1253, 1261 [crimes were committed in association with the gang because "[a] gang member who does not respond to an act of disrespect will lose stature within the gang"]; *People v. Hill*, *supra*, 191 Cal.App.4th at p. 1126 [noting the "importance of respect and exclusive gang turf to street gangs, which react violently to disrespect"].)

10

Fourth, Espinosa returned with another member of the gang who could serve as protection and could witness and confirm Espinosa's "loyalty to the gang, toughness, and reputation within the gang."[10] (See *People v. Albillar*, *supra*, 51 Cal.4th at p. 61 [citing to gang expert's testimony that "[o]ne of the most important things why gang members commit crimes together is the value of one gang member witnessing another gang member committing the crime because that gang member can share it with others or keep it within the group and bolster this person's status by their level of participation in the crime," and that "[b]y committing crimes together . . . gang members increase their status not only among those participating in the crimes, but also among the entire gang when fellow participants 'relay it' to other gang members"].) Indeed, "evidence that a gang member has committed a crime with another person whom he knows to be a fellow gang member will ordinarily be sufficient to meet the disjunctively worded elements of section 186.22, subdivision (b)(1)." (*People v. Leon* (2008) 161 Cal.App.4th 149, 162; see *People v. Hunt* (2011) 196 Cal.App.4th 811, 819 ["'fact . . . that the defendant had a fellow gang member in the stolen vehicle with him would support a finding that he acted in association with the gang'"].)

Fifth, the dispute occurred in territory claimed by the City Terrace 13 gang. Alvarado explained that gang members maintain control over the gang's territory and those who live in it, by creating fear among residents not to report the gang's criminal activities to law enforcement. Alvarado testified that non-gang members are reluctant

---

**10** Espinosa asserts that "no extrinsic evidence of Cervantes' gang membership was presented." Not so. Alvarado, who was assigned to investigate City Terrace 13 cases, testified that he was familiar with Cervantes from "numerous contacts" and believed he was a member of the City Terrace 13 gang. It is not entirely clear from the testimony whether these "contacts" were by Alvarado or others, although when Alvarado testified that he knew Espinosa was a member of the City Terrace 13 gang because of "numerous contacts," Alvarado explained that he meant personal contacts. In any event, counsel for Espinosa did not object to the questions about how Alvarado knew Cervantes was a member of the gang, and we view Alvarado's testimony in the light most favorable to the judgment.

11

to report a crime or testify and fear retaliation "because eventually they know they have to go back to their homes and they can't go anywhere else." The evidence showed that crimes of intimidation were partially successful in this case, in that Perez and, to a lesser extent, Canas changed their testimony (or at least remembered less) by the time of trial. Perez was particularly concerned about retribution from the gang because her family still lived in the same house in the gang's territory. (See *People v. Galvez*, *supra*, 195 Cal.App.4th at p. 1261 ["crimes were committed for the benefit of the gang because," as the gang expert explained, beating of victim "in a public place in gang territory 'promotes fear, which, in essence, promotes their gang and their brutality to the community in which they live'"]; *People v. Miranda*, *supra*, 192 Cal.App.4th at p. 413 [substantial evidence supported the gang enhancement where "there was evidence that defendant was accompanied by fellow gang members, the crime was committed in the gang's territory, and the gang's name was called out"].)

Finally, Espinosa's possession of a firearm and assault with a firearm were two of the activities that Alvarado identified with the City Terrace 13 gang. These facts provide additional evidence that Espinosa committed the crime for the benefit of or in association with City Terrace 13. (See *People v. Sanchez* (2014) 223 Cal.App.4th 1, 12 [that "defendant's crimes involved *both* of the gang's primary activities" was substantial evidence of gang enhancement].)

The cases cited by Espinosa, *People v. Ochoa* (2009) 179 Cal.App.4th 650 and *People v. Ramon* (2009) 175 Cal.App.4th 843, are distinguishable. In *Ochoa*, the defendant "did not call out a gang name" or give any other indication that he was a member of a gang, the defendant "made no apparent gang signs or signals during his commission of the crimes," the victim testified only that the defendant looked "a little" like a gang member, and "the prosecutor did not pose any hypothetical to the gang expert . . . ." (*Ochoa*, *supra*, at pp. 653, 662, 663, 664; *People v. Miranda*, *supra*, 192

Cal.App.4th at p. 413 [distinguishing *Ochoa*].)[11] In *Ramon*, the gang expert opined that "the circumstances involved in this case—two gang members driving a recently stolen vehicle in gang territory with an unregistered firearm in the vehicle," benefitted the gang because the two gang members "could commit" crimes such as robbery, burglary, and carjacking while they were in possession of the truck and the firearm. (*Ramon*, *supra*, at p. 848.) The *Ramon* court held that the expert "simply informed the jury of how he felt the case should be resolved" and that the expert's opinion was "an improper opinion [that] could not provide substantial evidence to support the jury's finding." (*Id.* at p. 851.) The *Ramon* court concluded that "[w]hile it is possible the two were acting for the benefit of the gang, a mere possibility is nothing more than speculation," and "[s]peculation is not substantial evidence." (*Ibid.*; see *People v. Hunt*, *supra*, 196 Cal.App.4th at p. 822 [distinguishing *Ramon* on the ground that in *Ramon* "the expert had not identified the crime the defendant and his fellow gang member committed as one of the activities of the gang"]; *People v. Miranda*, *supra*, 192 Cal.App.4th at p. 413 [same].)[12]

B.  *The Reference to Espinosa's Probation and Arrest Did Not Deprive Him of a Fair Trial*

During direct examination by the prosecutor, Alvarado testified that he was familiar with Espinosa "[f]rom numerous contacts." The following exchange then occurred:

---

[11]  In *People v. Vang*, *supra*, 52 Cal.4th 1038 the Supreme Court partially overruled *Ochoa* by holding "'[e]xpert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . section 186.22, subdivision (b)(1), gang enhancement. [Citation.]" (*Id.* at p. 1048.)

[12]  In addition, "*Ramon* . . . concerned the sufficiency of the evidence to support the specific intent prong of gang enhancement (§ 186.22[, subd.] (b)(1)) allegations." (*People v. Rios* (2013) 222 Cal.App.4th 542, 566; see *People v. Ramon*, *supra*, 175 Cal.App.4th at p. 853.) As noted, Espinosa does not challenge the sufficiency of the evidence on this prong.

13

"Q      [The Prosecutor]:  When you say numerous contacts, what do you mean by that?

"A      As a patrol deputy and, specifically, as a gang-detail deputy in 2008, I was involved in a probation compliance search at the defendant's home wherein other members of the City Terrace gang were in his home at the time and the defendant was ultimately arrested for possession —

"[Counsel for Espinosa]:    Your honor, I'm going to object.  Motion to strike.

"The Court:  Sustained.

"[Counsel for Espinosa]:    Ask that a proper admonition be given.

"The Court:  Don't go into that material.

"Q      [The Prosecutor]:    So on that day, did you ask the defendant if he was a member of a gang?

"A      Yes.

"Q      And what was his response?

"A      He was a member of the City Terrace 13 gang and he was known as Travieso."

Espinosa argues that "Alvarado's references to [his] probationary status and his ultimate arrest for possession were extremely prejudicial" and denied him his right to a fair trial.  Espinosa asserts that "[o]nce the jury heard [he] had been on probation, a probation search had been conducted wherein *other members of City Terrace* were in [his] house at the time, and [he] was ultimately arrested for possession, it would have been very difficult for the jury not to be influenced by this information, particularly since it came from an expert witness."

The problem with Espinosa's argument is that the trial court sustained the objection and, although the trial court did not give a "proper admonition," counsel for Espinosa did not ask for a better one.  The trial court, rather than admonishing the prosecutor or the witness not to "go into that material," should have directed the admonition to the jurors.  The trial court should have sustained the evidentiary objection, granted the motion to strike, and instructed the jury at that point to disregard the

14

objectionable portion of Alvarado's testimony.  Counsel for Espinosa, however, did not request a clarification of the instruction or any additional instruction or admonition. Therefore, Espinosa has forfeited any challenge to the adequacy of the instruction.  (Cf. *People v. Harris* (2013) 57 Cal.4th 804, 858 [defendant forfeited claim by "fail[ing] to request that the trial court admonish the jury to disregard [a] remark" in closing argument]; *People v. Gonzales* (2012) 54 Cal.4th 1234, 1275 [failure to request admonition after the trial court sustained objections to references to Hitler and Bosnia forfeited claim of misconduct]; *People v. Thomas* (2012) 53 Cal.4th 771, 822 [failure "to request an admonition" after trial court sustained objection to improper question forfeited claim of error].)  There is no indication in the record, or suggestion by Espinosa, that any request for a further or additional instruction would have been futile.[13]  (See *People v. Pearson* (2013) 56 Cal.4th 393, 425 [claims of erroneous evidentiary rulings forfeited where "[n]othing in the record suggests any objections or request for an admonition would have been futile"].)  To the contrary, the record suggests that the trial court would have granted such a request had counsel for Espinosa made it.  (See *People v. Abel* (2012) 53 Cal.4th 891, 929 [defendant was not "excused from the necessity of making a timely objection or request for admonition" because there was "no reason to assume the court would have been unresponsive to other complaints about the prejudicial nature of the evidence had defendant made a meritorious objection"].)

In any event, Alvarado's reference to an earlier probation and arrest did not deprive Espinosa of a fair trial.  The reference was isolated, brief, and curable, and the trial court sustained counsel for Espinosa's objection.  (See *People v. Lewis* (2008) 43 Cal.4th 415, 501 [trial court properly denied motion for mistrial based on deputy sheriff's reference to "'"ex-cons" in the apartment'" searched by law enforcement where the

---

**13**    "To preserve an evidentiary issue for appeal, the complaining party generally is required to make a timely and meaningful objection in the trial court. . . .  The duty to object will be excused when an 'objection or request for admonition would have been futile or would not have cured the [alleged] harm . . . .' [Citation.]" (*People v. Carrillo* (2004) 119 Cal.App.4th 94, 101; see *People v. Jackson* (2014) 58 Cal.4th 724, 762.)

"testimony did not result in prejudice that was incurable by admonition"]; *People v. Valdez* (2004) 32 Cal.4th 73, 123 [detective's "fleeting reference to 'jail' was not 'so outrageous or inherently prejudicial that an admonition could not have cured it'"]; *People v. Leavel* (2012) 203 Cal.App.4th 823, 831 [trial court properly denied mistrial based on detective's reference to serving defendant with a search warrant at a detention center where "[t]he single reference to [the] detention center was easily cured by striking the evidence and admonishing the jury to disregard it"].) Moreover, unlike the cases cited by Espinosa,[14] there is no suggestion or indication in the record, or argument by Espinosa on appeal, that the prosecutor was attempting to have Alvarado testify about Espinosa's prior probation and arrest. The question did not call for such information but instead was designed to solicit testimony directly relevant to the issues of how Alvarado knew Espinosa and whether Espinosa was a member of the City Terrace 13 gang.

C.     *Remand is Required to Correct an Unauthorized Sentence*

As noted, the trial court sentenced Espinosa to the upper term of four years, and imposed both a ten-year violent felony gang enhancement pursuant to section 186.22, subdivision (b)(1)(C), and a four-year personal firearm use enhancement pursuant to section 12022.5, subdivision (a). Section 1170.1, subdivision (f), provides in relevant part: "When two or more enhancements may be imposed for being armed with or using a

---

[14]     *People v. Figuieredo* (1955) 130 Cal.App.2d 498, 506 [prosecutor "knew that the conversation to be related by the [witness] would show that [the defendant] had been in San Quentin," and the trial court denied a motion to strike]; *People v. Ozuna* (1963) 213 Cal.App.2d 338, 341 ["testimony of the officer as to defendant's statement that he was an ex-convict was not unexpected; it was calculated"].) In *People v. Allen* (1978) 77 Cal.App.3d 924, the court did conclude that a witness' statement that the defendant was "'on parole'" could not be cured by an instruction, but acknowledged that it was an "extremely close case" with "exceptional circumstances." (*Id.* at pp. 934, 935.) In contrast, this case was not particularly close, given the descriptions of the events by Canas and Perez, and, unlike *Allen*, did not involve another error regarding the improper exclusion of evidence relevant to the testimony of the prosecution's main witness. (See *id.* at pp. 931-932.)

16

dangerous or deadly weapon or a firearm in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense. . . ."  In *People v. Rodriguez* (2009) 47 Cal.4th 501 the Supreme Court held that the additional punishment for committing a violent felony to benefit a criminal street gang under section 186.22, subdivision (b)(1)(C), and the additional punishment for personal use of a firearm under section 12022.5, subdivision (a), "fall squarely within the limiting language of section 1170.1's subdivision (f)."  (*Id.* at p. 508; see *People v. Martinez* (2012) 208 Cal.App.4th 197, 199 ["trial court improperly imposed enhancements for both personal firearm use (§ 12022.5, subd. (a)) and committing a violent felony to benefit a criminal street gang (§ 186.22, subd. (b)(1)(C))"].)

Here, as in *People v. Rodriguez*, Espinosa was eligible for a ten-year violent felony gang enhancement only because he used a firearm.  As the People concede, section 1170.1 prohibited the imposition of both enhancements, and consequently the trial court imposed an unauthorized sentence.  (See *People v. Smith* (2001) 24 Cal.4th 849, 852 [unauthorized sentences are reviewable even though not raised by either party at trial or on appeal].)[15]  We will remand the matter to the trial court because "[t]he proper remedy" is not to strike one of the enhancements "but to reverse the trial court's judgment and remand the matter for resentencing," in order to "give the trial court an opportunity to restructure its sentencing choices in light of our conclusion that the sentence imposed here violated section 1170.1's subdivision (f)."  (*People v. Rodriguez*, *supra*, 47 Cal.4th at p. 509.)

---

**15**    Pursuant to Government Code section 68061, we gave the parties an opportunity to file supplemental briefs regarding the trial court's imposition of sentence enhancements pursuant to section 186.22, subdivision (b)(1)(C), and section 12022.5, subdivision (a), and *People v. Rodriguez*, *supra*, 47 Cal.4th 501.

## DISPOSITION

The judgment of conviction is affirmed.  The sentence is reversed and the matter is remanded for resentencing only.


SEGAL, J.[*]


We concur:


WOODS, Acting P. J.


ZELON, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.